UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**CAMERON LEE LUKE,**

                  Plaintiff,

    v.

**MAX WILLIAMS, Director
of Oregon Department of
Corrections, et al.,**

                  Defendants.

No. CV 09-CV-307-MO

OPINION AND ORDER

**MOSMAN, J.,**

      Cameron Lee Luke filed this suit against Oregon Department of Corrections ("ODOC") employees for inhibiting his practice of the Wiccan religion in violation of his rights under: the Religious Land Use and Institutionalized Persons Act ("RLUIPA"); the Free Exercise clause of the First Amendment of the United States Constitution; Article I, Sections 2, 3, and 33 of the Oregon Constitution; the Equal Protection clause of the Fourteenth Amendment; and the Eighth Amendment's prohibition against cruel and unusual punishment.

      Mr. Luke seeks injunctive relief and $30,000 in compensatory damages. Defendants filed a Motion for Summary Judgment (#36) arguing: (1) no constitutional or statutory violation occurred; (2) damages are unavailable under RLUIPA, and defendants have qualified immunity from damages for any constitutional violation; and (3) defendants Williams and Nooth cannot be held liable under a respondeat superior theory.

Because I agree with defendants that Mr. Luke has not put forth evidence of any constitutional or statutory violation, I GRANT defendants' Motion for Summary Judgment (#36).

**FACTUAL BACKGROUND**

The material facts in this case are largely undisputed. To the extent there are disputed facts, I view the facts—and inferences from those facts—in the light most favorable to plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Mr. Luke alleges that while he was housed in Snake River Correctional Institution's ("SRCI") special housing Intensive Management Unit ("IMU"), ODOC employees infringed Mr. Luke's ability to practice Wicca[1] by denying him (1) the ability to bring personal items to the IMU yard in order to practice Wiccan rituals; (2) a full-time Wiccan volunteer to serve his religious needs; and (3) books from the general population Chapel Library and materials from the Internet. Mr. Luke also complains that ODOC did not provide him a wand, an adequate bowl, or enough salt.

The parties agree that IMU inmates are allowed to perform rituals and possess certain

---

[1] ODOC Chaplain Steven Toth offers the following description of Wicca, which Mr. Luke does not dispute:

> Wicca is a neopagan religion whereby adherents typically worship a duotheistic God and Goddess. There are various different denominations within Wicca, and each is referred to as a separate tradition. Wiccan beliefs can vary between different traditions. Rituals are often one method of connecting the adherent to the Wiccan belief system. Wicca does not have a set holy book, such as the Bible, but adherents instead look to many sources for spiritual guidance. Practitioners of Wicca may practice alone or in groups, and without the assistance of a spiritual advisor.

(Toth Decl. (#38) ¶ 4.)

items in their cells, including a pentacle medallion, a spiritual journal ("Book of Shadows"), rune cards, Tarot cards, a wooden wand (with staff approval), salt, water, a small bowl, a feather, an alter cloth with pentacle, a plain cloth, scented oil, and two soft-cover spiritual books. (Toth Decl. (#38) ¶¶ 9–11.) IMU inmates also have access to certain library books via mobile book carts.

The IMU's rules and regulations are stricter than those applied to the general SRCI population because the IMU houses the state's highest-risk inmates. (Cain Decl. (#37) ¶ 5.) The IMU contains inmates who the ODOC believes "cannot be controlled in other housing as indicated by high severity and/or chronic misconduct sanctions, escape activity or security threat group activities causing serious management concerns." (Cain Decl. (#37) ¶ 7 (citing Or. Admin. R. 291-055-019(1)).)

## DISCUSSION

### I.    Legal Standard for Summary Judgment

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). After a party moves for summary judgment and properly supports that motion with evidence, the burden of production shifts to the opposing party. Fed. R. Civ. P. 56(e)(2). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotes omitted).

Federal Rule of Civil Procedure 56(e)(2) provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

*See also Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (holding that a "district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found").

Because Mr. Luke is proceeding pro se, I must construe the pleadings liberally and afford him the benefit of any doubt. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## II. RLUIPA

RLUIPA prevents states from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the state can establish that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). The Ninth Circuit has outlined three steps for analyzing this provision of RLUIPA. *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 987 (9th Cir. 2008). First, plaintiff must identify the "religious exercise" he alleges is burdened. *Id.* Next, plaintiff must show that the relevant prison regulation "substantially burdens" the religious exercise he identified. *Id.* In order to establish a "substantial burden," plaintiff must show that the relevant restriction "denies an important benefit [derived from] conduct mandated by religious belief, thereby putting substantial pressure

on an adherent to modify his behavior and to violate his beliefs." *Shakur v. Shriro*, 514 F.3d 878, 888 (9th Cir. 2008) (internal quotations omitted). Finally, if plaintiff has established that the religious exercise is substantially burdened, I must determine whether that burden "furthers a compelling governmental interest, and does so by the least restrictive means." *Greene*, 513 F.3d at 988 (internal quotes and citations omitted).

      A.     *Burden on Religious Exercise*

Mr. Luke's various pleadings allege several restrictions regarding his practice of Wicca: (1) he was not allowed to bring personal religious items into the yard to perform rituals; (2) ODOC employees did not provide him with a Wiccan volunteer to guide his practice of Wicca; (3) he was not allowed to check out books from the Chapel Library or request materials from the Internet, but was instead limited to the four Wiccan books available on the circulation carts; (4) ODOC would not purchase a wand for him, and the bowl and salt ODOC provided were inadequate. (Compl. (#2) 4B; Pl.'s Resp. (#44) 1, 8.)

Mr. Luke has not provided evidence that these restrictions constitute a "substantial burden" on his practice of the Wiccan faith.

      1.     **Personal Items in the Yard; Outdoor Rituals**

Mr. Luke argues that he should have been allowed to take his "personal religious material outside for solitary practice." (Compl. (#2) 4B.) However, he offers no evidence that this restriction denied him an important benefit derived from conduct mandated by religious belief. Mr. Luke concedes that he "had no issue" with having to conduct his rituals in his cell, and contends only vaguely that "outdoor worship is very helpful and even key to the practice of our faith" and "there are certain rites which are meant to be conducted outdoors." (Pl.'s Resp. (#44)

1, 4.)

As noted above, Mr. Luke was allowed to possess numerous religious items in his cell, and he offers no evidence of important rituals that cannot be performed indoors.[2] By contrast, defendants offer evidence that Mr. Luke did practice some rituals outside. (Suppl. Cain Decl. (#50) Attach. 3.) Defendants also consulted with multiple Wiccan clergy members, one of whom stated that "Wiccan ceremonies are very personal and can be purely meditative; no special property is needed for this." (Toth Decl. (#38) Attach. 1 at 10.) Mr. Luke has offered no evidence to rebut defendants' evidence, so I accept defendants' evidence as undisputed for purposes of this motion.[3]

In sum, defendants have presented evidence that Mr. Luke may practice Wiccan rituals freely with his religious materials in his cell, and without materials outside. Mr. Luke offers no evidence of any particular restriction to counter this evidence. Therefore, Mr. Luke has not

---

[2] Although Mr. Luke does not discuss any particular rituals in his pleadings, the record does contain reference to a "Full Moon Ritual" that Mr. Luke asked to perform outdoors. (Toth Decl. (#38) Attach. 1 at 1.) However, nowhere has Mr. Luke indicated that this particular ritual was important to his practice of Wicca, or shown that equally meaningful rituals could not have been performed indoors.

Moreover, in his request, Mr. Luke indicated a lengthy list of devotional accessories that he expected ODOC to provide to facilitate this ritual, including: Incense in a holder, a shell containing salt water, a candle, an Earth Pentacle, a Wand of Double Power, a chalice of juice, a loaf of bread, a fan, a Fire Wand, and water in a chalice. (Toth Decl. (#38) Attach. 1 at 1.) As discussed further below, the State is not required to provide devotional accessories. *Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005). To the extent that Mr. Luke complains of treatment unequal to that of Native Americans, this argument is addressed below in the Equal Protection discussion.

[3] To be clear, my acceptance of defendants' evidence as undisputed does not mean I consider that evidence to be authoritative proof of Wiccan beliefs and practices outside the context of this motion. Rather, because defendant's motion for summary judgment is properly made and supported, the burden shifts to Mr. Luke to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). He has not done that here.

clearly established that a particular exercise of his religion was burdened by the prison-yard regulations, nor has he established that the regulations created a "substantial burden" regarding any specific religious exercise. *See Greene,* 513 F.3d at 987.

### 2. Wiccan Volunteer

Mr. Luke's claim that he is entitled to a Wiccan volunteer is without merit. SRCI does not have a permanent Wiccan volunteer, and Mr. Luke has alleged no regulation or policy by which SRCI would deny him contact with a Wiccan volunteer should one have visited SRCI during Mr. Luke's incarceration there. (Toth Decl. (#38) ¶¶ 6–7.) Neither does Mr. Luke offer evidence that practicing Wicca requires a trained professional spiritual leader; on the contrary, defendants cite undisputed evidence that Wicca is a highly decentralized religion, which adherents may practice freely alone or in groups. (Toth Decl. (#38) ¶ 4.)

### 3. Chapel Library and Internet Materials

Mr. Luke claims that he was not allowed access to the general Chapel Library and that ODOC employees refused to download Wiccan materials from the Internet for him—although he does not name any particular book that he requested from the Chapel Library nor the specific Internet materials to which he was denied access. He offers no evidence that the lack of unspecified materials substantially hindered his practice of Wicca. Defendants assert that there were four books on Wicca available on the special housing book carts, and Mr. Luke was allowed to purchase books from outside vendors. (Toth Decl. (#38) ¶ 11; Compl. (#2) 4B.) Moreover, IMU inmates were allowed to request books from the Chapel Library, and certain books would be added to the circulation carts permanently if the library had more than one copy. (Cain Decl. (#37) ¶ 14.)

Mr. Luke cites no evidence to contradict these assertions, and instead argues only that he would have preferred other books and Internet materials—partly because the existing books were sometimes in poor condition—and he could not afford to purchase outside materials. (Compl. (#2) 4B; Pl.'s Resp. (#44) 7.) Mr. Luke does not claim any particular books are essential to his practice of Wicca. Ultimately, Mr. Luke's unspecific preferences in reading material do not implicate a substantial burden on his religious practice, and "RLUIPA does not require a State to pay for an inmate's devotional accessories." *Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005).

### 4.     Other Personal Items

Mr. Luke contends that ODOC was required to provide him a wand, a particular kind of bowl, and salt of a certain quantity and quality. Again however, the state is not required to supply devotional accessories. *Id*. Mr. Luke even concedes that defendants provided him with paper bowls and some quantity of salt with which to perform rituals. (Pl.'s Resp. (#44) 8.) RLUIPA requires no more. And in light of the uncontroverted evidence ODOC has submitted, that the Wiccan clergy member who advises the Religious Services Administration of ODOC on Wiccan practice said no special property is needed, ODOC has gone beyond what RLUIPA requires.

### B.     *Least Restrictive Means to Effectuate a Compelling Government Interest*

Because I have determined that Mr. Luke has not identified any substantial burden on his religious exercise, I need not analyze whether the ODOC's policies further a compelling governmental interest using the least restrictive means.

## III.   Free Exercise Clause of the First Amendment

Mr. Luke also claims that the restrictions discussed above violated his rights under the

Free Exercise clause of the First Amendment. In order to succeed on a Free Exercise claim, Mr. Luke must establish that the state infringed upon a sincerely-held religious belief, and that the state's justification is not reasonably related to legitimate penological interests. *See Turner v. Safley,* 482 U.S. 78, 89 (1987); *Shakur*, 514 F.3d at 884–85. *Turner* provides four factors to consider in balancing the prisoner's rights against the state's interests in safe and efficient prison operation: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." 482 U.S. at 89–90. In conducting this analysis, courts are to give significant deference to the views of prison officials in light of the "inordinately difficult" nature of prison operation. *Id.* at 84–85.

Mr. Luke has not identified any particular prohibited ritual, personal item, or reading material to which I may apply the *Turner* factors. Mr. Luke states that he would *like:* (1) to have access to a full-time Wiccan volunteer; (2) to take his religious materials outdoors to perform unspecified rituals;[4] (3) to have additional books and Internet materials beyond the four Wiccan books available to him; and (4) to have the prison supply him with a wand and other materials. As I concluded above in the RLUIPA analysis, Mr. Luke's claims that the prison should provide

---

[4] As noted above, apparently Mr. Luke did at one time ask ODOC to allow him to perform the "Full Moon Ritual" in the IMU yard. Again however, Mr. Luke does not offer any evidence that he had purchased the necessary items to perform that ritual and was denied the opportunity; rather, the crux of his request appeared to be for ODOC to provide him with the lengthy list of accessories he included with the request. This argument is foreclosed. *See Cutter,* 544 U.S. at 720 n.8.

him a full-time Wiccan volunteer and various devotional accessories are without merit.

Regarding Mr. Luke's desire to take personal items outside and to access additional reading materials, I am unable to apply the *Turner* factors in any meaningful way without specific information about the rituals he would have liked to perform or the reading materials he allegedly needed—especially some information about the importance of each in Mr. Luke's practice of Wicca. Without that information, I am unable to determine whether there are "alternative means of exercising the right," what the impact would be on guards and other inmates, or whether there are "ready alternatives" to the regulation.[5] *See Turner*, 482 U.S. at 89–90. Thus, I find no restriction to which I may apply the *Turner* factors.

To the extent I am able to discern Mr. Luke's general concerns, I find that each of the four *Turner* factors weighs in favor of defendants here. Of central importance is the IMU's classification as a maximum-security ward that houses those inmates who pose the highest risks to institutional safety. Within that context, defendants offer further evidence that: (1) the policies in question are carefully tailored to meet legitimate safety and efficiency concerns; (2) Mr. Luke has ample alternative means of exercising his rights; (3) honoring Mr. Luke's requests would have a substantial impact on ODOC employees and other inmates; and (4) there are no ready alternatives available to ODOC. (Def.'s Memo. in Supp. (#39) 13–16.)

In rebuttal, Mr. Luke offers unworkable alternatives. For example, Mr. Luke proposes that the chaplain should have been required to bring books from the chapel library to Mr. Luke personally. (Pl.'s Resp. (#44) 6.) I agree with defendants that such a solution—especially if

---

[5] For example, if Mr. Luke desired to perform an outdoor ritual involving sharp objects and fire, for which there are ample alternative rituals, the *Turner* factors may balance differently than they would regarding an essential ritual involving a more benign object.

made available to all IMU inmates—would be costly and unwieldy, and likely would not have adequately dealt with legitimate institutional concerns about unauthorized inmate communications. (Def.'s Reply (#48) 13; Suppl. Cain Decl. (#50) ¶12.)

## IV.     Oregon Constitution

Mr. Luke also raises claims under the Oregon Constitution. However, the Oregon Supreme Court has held that there is no private right of action for damages under the Oregon Constitution. *See Hunter v. Eugene*, 787 P.2d 881, 883 (Or. 1990). Mr. Luke's pleadings could also be read to include claims for injunctive relief, but such claims would fail for at least three reasons.

First, Mr. Luke's claims for injunctive relief are likely moot. "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citing *Flast v. Cohen*, 392 U.S. 83, 94–101 (1968)). "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1095 (9th Cir. 2004) (internal quotes and citations omitted). Here, Mr. Luke is no longer imprisoned at the SRCI, and there appears to be no likelihood he will return. Thus, he no longer has a justiciable interest in whether injunctive relief is granted regarding the IMU at SRCI. *See id.* (holding that a "[prisoner's] release extinguishes his legal interest in an injunction because it would have no effect on him").

Second, even if this court had jurisdiction over Mr. Luke's claims for injunctive relief under the Oregon Constitution, he has not offered evidence of any specific restriction of his right to practice Wicca to which a constitutional test might be applied. Nor does he cite legal support

for holding that any ODOC restriction violates the Oregon Constitution.

Finally, even if the substantive standards of the Oregon Constitution applied, Mr. Luke's claims would still fail. Under the Oregon Constitution: "A law that is neutral toward religion or nonreligion as such, that is neutral among religions, and that is part of a general regulatory scheme having no purpose to control or interfere with rights of conscience or with religious opinions does not violate the guarantees of religious freedom in Article I, sections 2 and 3." *Meltebeke v. Bureau of Labor & Indus.*, 903 P.2d 351, 361 (Or. 1995). Here, the IMU's prohibitions—against taking personal materials outside and accessing the general population library—are neutral toward religion and part of a general regulatory scheme with a clear purpose of institutional safety. Mr. Luke offers no evidence to the contrary, and thus his claims under the Oregon Constitution may not proceed to trial.

**V.     Equal Protection**

Mr. Luke asserts that the IMU's restrictions also violated his rights under the Equal Protection clause of the Fourteenth Amendment, which "entitles each prisoner to a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners." *Shakur*, 514 F.3d at 891 (internal quotes and citations omitted). However, prisons are not required to provide identical opportunities to all prisoners; instead we must ask "whether there has been a good faith accommodation of the [prisoner's] rights in light of practical considerations." *Allen v. Toombs*, 827 F.2d 563, 568–69 (9th Cir. 1987).

Here, Mr. Luke alleges one comparison that potentially implicates Equal Protection: that Native Americans are occasionally allowed to perform smoke rituals outside, while Mr. Luke was not allowed to conduct outdoor rituals. However, defendants explain that Native Americans

are allowed to perform this ritual outside because, according to religious authorities ODOC has consulted, the ceremony is essential to Native Americans' religious exercise and must be performed outside in order to be meaningful. The chaplain also keeps the materials and closely supervises the smoke ritual. (Cain Decl. (#37) ¶ 13; Toth Decl. (#38) ¶ 10.)

Mr. Luke points to no evidence that ODOC prevented him from performing outdoor rituals that are important to his practice of Wicca. Defendants have offered credible, largely undisputed evidence that Wiccan rituals are adequately performed indoors with the religious materials inmates are allowed to keep in their cells. (Toth Decl. (#38) ¶ 10.) Regarding the ritual Mr. Luke requested to perform outdoors—the "Full Moon Ritual" discussed above—Mr. Luke has not alleged that this ritual is important to his practice of Wicca. Defendants also offer undisputed evidence that Mr. Luke had the opportunity to apply through an established process to qualify a particular ritual for performance in the IMU, but apparently did not do so. (Toth Decl. (#38), Attach. 1 at 13.)

In short, Mr. Luke has not offered any evidence that he was denied a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners." *Shakur,* 514 F.3d at 891. His Equal Protection claim therefore fails.

## VI.     Eighth Amendment

Mr. Luke's claim under the Eighth Amendment is without merit. He does not allege "deprivations denying the minimal civilized measure of life's necessities" so as to state an Eighth

Amendment claim regarding the conditions of his confinement. *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (internal quotes and citations omitted).

    IT IS SO ORDERED.

    DATED this  18th  day of November, 2010.

/s/ Michael W. Mosman  
MICHAEL W. MOSMAN  
United States District Court